**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>JERSEY CITY COMMUNITY HOUSING CORPORATION | Case No. 21-15863-JKS |
| CITY OF JERSEY CITY,<br><br>        *Appellant*,<br><br>  v.<br><br>JERSEY CITY COMMUNITY HOUSING CORPORATION,<br><br>        *Appellee*. | Civil Action No. 22-5277-JMV<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

      This appeal challenges the Bankruptcy Court's approval of a bankruptcy debtor's sale of real property over the objections of a creditor.  The City of Jersey City ("Jersey City") brings this appeal from the order (the "Sale Order")[1] of the Bankruptcy Court (Hon. John K. Sherwood, U.S.B.J.) granting the motion of Jersey City Community Housing Corporation ("JCCH" or "Debtor") to sell real property located at 108 Storms Avenue, Jersey City, New Jersey (the "Storms

---

[1] The order is filed on the docket in this Court at D.E. 1-2 and was filed on the Bankruptcy Court docket, No. 21-15863, ("Bankr. Dkt.") at D.E. 153.

Property") to a third party, 108 Storms JC LLC (the "Purchaser").  The court-approved sale closed on September 12, 2022 (the "Sale").  Jersey City filed this appeal, and presently before the Court is the Debtor's motion to dismiss the appeal as statutorily moot pursuant to 11 U.S.C. § 363(m).  D.E. 14.  On March 13, 2023, the Court also ordered the parties to submit briefing on the merits of the appeal.  D.E. 23.  The Court reviewed the parties' submissions[2] and decided the motion and appeal without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b).  For the following reasons, JCCH's motion to dismiss is **GRANTED** and, in the alternative, the Court **AFFIRMS** the Bankruptcy Court on the merits.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY[3]

On September 27, 2004, Jersey City and JCCH entered into an agreement (the "Development Agreement") whereby Jersey City conveyed to JCCH two properties, one of which was the Storms Property[4]; JCCH was to develop the properties into multi-unit affordable housing.  D.E. 21-6 at 19-50.  JCCH agreed to affordable housing deed restrictions which would run with the property for thirty years.  *Id.* at 29-30.  The Development Agreement contemplated that the properties would be "rent out ready" by May 2011, *id.* at 47, but they remained incomplete in 2019.[5]  Jersey City then brought a foreclosure action against JCCH in the Superior Court of New

---

[2] The submissions for the motion to dismiss consist of the Debtor's motion, D.E. 14 ("Br."); Jersey City's opposition, D.E. 21 ("Opp."); and the Debtor's Reply, D.E. 22 ("Reply").  The submissions for the appeal consist of Jersey City's merits brief, D.E. 13 ("Merits Br."); Debtor's opposition, D.E. 24 ("Merits Opp."); and Jersey City's reply, D.E. 26 ("Merits Reply").

[3] The facts are drawn from the appendix exhibits to Appellant's Merits Brief, D.E. 18, as well as the exhibits to the other submissions before the Court.

[4] The other property was 299 Bergen Avenue (the "Bergen Property"), but that property is not at issue here.  Both properties, however, were subject to the same blanket mortgage.

[5] JCCH indicates that the Storms Property was approximately ninety percent complete when the present motion to dismiss was filed in October 2022.  Br. at 4 n.2.

Jersey, Hudson County, captioned *City of Jersey City v. Jersey City Community Housing, et al.*, No. F-017453-19.  On March 15, 2021, that court entered final judgment in Jersey City's favor (the "Foreclosure Judgment").  D.E. 2-16 at 53-56.  The total amount of the Foreclosure Judgment was $733,006.01, with $125,408.53 allocated to the Storms Property and the remaining $647,597.48 allocated to the Bergen Property.  *Id.* at 54.

Before the Storms Property could be sold in foreclosure, JCCH filed a voluntary bankruptcy petition pursuant to Chapter 11 on July 20, 2021.  Bankr. Dkt. D.E. 1.  On July 25, 2022, Debtor filed a motion to sell the Storms Property pursuant to 11 U.S.C. § 363, free and clear of all liens, claims, encumbrances, and interests.  D.E. 18-1 (the "Sale Motion"); Bankr. Dkt. D.E. 133.  The sale contract listed the purchaser as 108 Storms JC LLC and a purchase price of $675,000.  D.E. 18-1 at 22-33.  Two hearings were held in connection with the Sale Motion, and the Bankruptcy Court heard testimony from Ann Marie Griffiths (Purchaser's principal), D.E. 18-14, and Deja Anderson (Jersey City's Director of the Department of Housing, Economic Development & Commerce), D.E. 18-15.

Debtor also submitted an appraisal of the Storms Property, dated July 15, 2022, which valued the property at $1,040,000 "as-is" (rounded) and $1,350,000 market value upon completion.  D.E. 18-1 at 42-75 (the "July 2022 Appraisal").  The July 2022 Appraisal did not take into account the low income housing deed restrictions on the property, which the Bankruptcy Court noted "certainly[] should be factored into value."  D.E. 21-17 at 6:12-21.  The Bankruptcy Court was also presented with and considered an earlier appraisal, effective October 24, 2021, which valued the Storms Property at $400,000 with an assumption that its development was fifty percent complete.  D.E. 14-5 (the "October 2021 Appraisal"); D.E. 21-17 at 6:22-7:3.

3

On August 23, 2022, the Bankruptcy Court rendered an oral decision granting the Sale Motion and entered the Sale Order.  D.E. 21-17; D.E. 1-2.  Jersey City filed its notice of appeal on August 29, 2022.  D.E. 1.  That same day, Jersey City filed a motion for emergent relief staying the Bankruptcy Court's Sale Order pending appeal pursuant to Fed. R. Bankr. P. 8007(b).  After hearing oral argument, this Court denied that motion on August 30, 2022.  D.E. 9.  The Sale closed on September 12, 2022.  D.E. 14-3.  The motion to dismiss followed.  D.E. 14.  Thereafter, the Court ordered the parties also to complete briefing on the merits of the appeal.  D.E. 23.

## II.    APPELLATE JURISDICTION[6] AND STANDARD OF REVIEW

A district court has appellate jurisdiction over the final judgments, orders, and decrees of a bankruptcy court. 28 U.S.C. § 158(a)(1).  When sitting as an appellate court reviewing a decision of the bankruptcy court, a district court "'review[s] the bankruptcy court's legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof.'"  *In re United Healthcare Sys., Inc.*, 396 F.3d 247, 249 (3d Cir. 2005) (quoting *In re Trans World Airlines, Inc.*, 145 F.3d 124, 130-31 (3d Cir. 1998)); *In re Christ Hosp.*, No. 14-472, 2014 WL 4613316, at *5 (D.N.J. Sept. 12, 2014).

---

[6] JCCH initially argued, in its motion to dismiss and its opposition to the merits of the appeal, that "Appellant's failure to obtain a stay, and the subject property having been sold, effectively deprives this Court of jurisdiction under the express provisions of 11 U.S.C. § 363(m)." Merits Opp. at 2; Br. at 3.  Since those filings, however, the Supreme Court decided *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. __, 143 S. Ct. 927 (2023).  The Supreme Court held that § 363(m) does not affect a court's jurisdiction.  JCCH brought this decision to the Court's attention and withdrew "its argument that the Court lacks jurisdiction to consider the appeal."  D.E. 27.

### III.   ANALYSIS

#### A.   Appellee's Motion to Dismiss the Appeal as Moot

JCCH argues that the appeal is statutorily moot pursuant to 11 U.S.C. § 363(m), which provides as follows:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  "The purpose of § 363(m) is to promote the finality of sales."  *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 133 (3d Cir. 2017).  Particularly, the provision seeks "'to give finality to those orders and judgments upon which third parties rely.'"  *Pittsburgh Food & Beverage, Inc. v. Ranallo*, 112 F.3d 645, 648 (3d Cir. 1997) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)).  To determine if the appeal is moot under Section 363(m), the court must first determine whether the purchaser "purchased or leased such property in good faith."  11 U.S.C. § 363(m); *In re Pursuit*, 874 F.3d at 135-36.  If good faith is met, then Section 363(m) "moots a challenge to a sale if two [further] conditions are satisfied: '(1) the underlying sale or lease was not stayed pending appeal, and (2) the court, if reversing or modifying the authorization to sell or lease, would be affecting the validity of such a sale or lease.'"  *Id.* at 135 (quoting *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 499 (3d Cir. 1998)).

Jersey City argues that the Purchaser did not act in good faith "because the obvious purpose of the transaction was to permit Debtor, a bad faith actor, to recover the property after having wiped away all his [*sic*] obligations at pennies on the dollar."  Opp. at 19.  While Section 363(m) only applies where the purchaser acted in good faith, "[u]nfortunately, neither the Bankruptcy

Code nor the Bankruptcy Rules attempts to define 'good faith.'" *In re Abbots*, 788 F.2d at 147. Thus, courts have "turned to traditional equitable principles, holding that the phrase encompasses one who purchases in 'good faith' and for 'value.'" *Id.* (citation omitted). The good faith requirement "'speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status . . . involves fraud, collusion . . . or an attempt to take grossly unfair advantage of other[s].'" *Id.* (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *see also In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) (relying on *In re Abbots* and ruling that "the good-faith analysis is focused on the purchaser's conduct in the course of the bankruptcy proceedings. This includes the purchaser's actions in preparation for and during the sale itself. That is, the good-faith requirement prohibits fraudulent, collusive actions specifically intended to affect the sale price or control the outcome of the sale"). "An analysis of a purchaser's good faith status" requires the district court to "'exercise plenary review of the legal standard applied'" and review the bankruptcy court's "'findings of fact on a clearly erroneous standard.'" *In re Pursuit*, 874 F.3d at 135; *In re Christ Hosp.*, 2014 WL 4613316, at *5; *Mumma v. Double M Dev.*, No. 19-01194, 2020 WL 1690083, at *3 (M.D. Pa. Apr. 7, 2020).

The Bankruptcy Court found that the Sale was an "arm's length transaction," D.E. 21-17 at 7:15-8:15; that Purchaser acted "in good faith, as that term is used in Bankruptcy Code section 363(m), with respect to the sale," D.E. 1-2 at ¶ F; and that "[t]he Sale was negotiated, proposed and entered into by the parties in good faith, from arms'-length bargaining positions and without collusion, and, therefore, the [Purchaser] is entitled to the protections of" Section 363(m), *id*. Jersey City complained, here and below, that Dehere—Debtor's principal—was given a right of first refusal if the Purchaser ever decided to re-sell the Storms Property. Opp. at 19; *see also* D.E.

6

18-1 at 32.  Jersey City claims that "[t]here is no reason consistent with good faith why this term should be in the contract," and that it "permits Debtor to recover the property at some unknown future date, after having shed all his contractual obligations and debts for pennies on the dollar." Opp. at 19-20.  Jersey City also notes that the Purchaser has "no prior experience developing or managing an affordable housing project" and is a "full-time public-school special needs teacher who does not even live in New Jersey."  *Id.* at 23-24.  Jersey City further claims that Purchaser's financing involved "a balloon payment of over $740,000 at the 12-month maturity date" and that "[t]here was never any testimony explaining how [Purchaser] intended to make that sizable one-year balloon payment nor any proof she could afford it, suggesting there were undisclosed plans and machinations to flip the property."  *Id.* at 24.

The Bankruptcy Court, after two evidentiary hearings, made factual findings as to the arms'-length nature of the Sale.  Specifically, the Bankruptcy Court noted that the purchase price was "enough to pay off the three lien holders and the two objecting parties," including Jersey City's $125,408.53 foreclosure judgment.  D.E. 18-16 at 7:11-12.  The Bankruptcy Court continued that while Dehere and Griffiths had a "personal/business relationship," Debtor disclosed the relationship.  *Id.* at 7:23-8:1.  Moreover, the Bankruptcy Court continued, while Dehere retained a right of first refusal should Purchaser ever decide to sell the Storms Property, such a transaction "would be subject to approval by Jersey City" pursuant to the Development Agreement, and that "the low income housing restrictions [would] continue to run with [the] property."  *Id.* at 8:2-12.  The Bankruptcy Court concluded that the Sale was "negotiated, proposed and entered into by the parties in good faith, from arms'-length bargaining positions and without collusion."  D.E. 1-2 at ¶ F; *see also* D.E. 18-16 at 7:15-8:15.

7

This Court does not find clear error in those factual findings.  None of Jersey City's arguments are sufficient to clearly demonstrate fraud, collusion, or any other impropriety.  The right of first refusal, which the Bankruptcy Court noted was "unusual," was disclosed and presented to the Bankruptcy Court, *id.* at 8:2-12, as was the prior relationship between Griffiths and Dehere, *id.* at 7:15-8:1.  Jersey City retained the right to reasonable approval of any potential sale back to Dehere pursuant to the Development Agreement, and the Storms Property would remained encumbered by the affordable housing restrictions.  *Id.* at 8:2-12; *see also* Br. at 18 (Debtor agreeing that "the deed restrictions were preserved by the Sale Order" and that Jersey City's right to reasonable approval of future transfers "remains and it can prevent Mr. Dehere from exercising the right of first refusal").  Thus, Jersey City's claim that this Sale allows "Debtor to recover the property at some unknown future date, after having shed all his contractual obligations and debts for pennies on the dollar," Opp. at 20, is not borne out by the record.

While the absence of prior experience is relevant in considering the totality of the circumstances, such evidence is not dispositive.  *See In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, at *2 (Bankr. D.N.J. May 11, 2007) (finding that "circumstantial evidence" fell short of establishing collusion and that "[i]n order to find bad faith, the Court needs to rely on more than the settlement failing the 'smell test.'  An objector has to show more than an opportunity to collude; an objector must provide some evidence or indication of actual collusion").  Griffiths put $118,500 of her personal funds into the Sale and personally guaranteed the loan.  D.E. 21-9 at ¶ 7; D.E. 18-16 at 12:10-17 (noting that Purchaser is "highly incentivized to finish this project quickly, to get low income tenants in, and to start collecting rents.  And she knows that along the way she will have to comply with all of the low income housing restrictions"); D.E. 18-15 at 17:16-19 ("You have someone who's going on the hook personally for over $600,000.  She has got contractors

lined up and if there ever was a quick way to get this affordable housing on the market, this is it."). Griffiths also testified that she has been involved in the development of non-low income rental units in the past. *Id.* at 67:2-7.

In sum, the two days of hearings reflected that two represented parties agreed to a transaction in which (1) the proceeds ensured that Jersey City was paid the total amount due to it on the Storms Property under the Foreclosure Judgment (indeed, all lienholders were paid in full with a surplus to the Estate), (2) the Storms Property remained encumbered by the affordable housing deed restrictions, (3) the Storms Property's development would proceed so that Jersey City's residents may benefit from the affordable housing units, and (4) Jersey City retained its right to reasonable approval of future transferees. Based on this evidence, the Court sees no clear error in the Bankruptcy Court's determination that this was an arms'-length transaction made in good faith nor any error in the legal standard applied.

Jersey City also notes that pre-bankruptcy, JCCH breached its agreements with Jersey City multiple times by encumbering both the Storms Property and Bergen Property without Jersey City's prior written consent. Opp. at 20-22. The Third Circuit has made clear that the good faith inquiry "speaks to the integrity of [*the purchaser's*] conduct in the course of the sale proceedings," not the conduct of the debtor standing alone. *In re Pursuit*, 874 F.3d at 135 (alteration in original) (emphasis added) (quoting *In re Abbotts*, 788 F.2d at 147). Debtor's pre-bankruptcy breaches do not demonstrate fraud or impropriety by the Purchaser in the Sale.

As to value, "[t]raditionally, courts have held that '[f]air and valuable consideration is given in a bankruptcy sale when the purchaser pays 75% of the appraised value of the assets.'" *In re Abbotts*, 788 F.2d at 149 (quoting *In re Rock Indus.*, 672 F.2d at 1197 n.1); *see also In re Triangle Transp., Inc.*, 419 B.R. 603, 620 (Bankr. D.N.J. 2009) (noting that the "seventy-five

percent factor is the oft-used rule of thumb for evaluating and approving sales in bankruptcy"). However, this rule is not absolute, and bankruptcy courts may find that a proposed sale is for reasonable value where the sale price is less than seventy-five percent of the appraised value. *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985) (finding that a bankruptcy court's approval of a sale was not "clearly erroneous" despite the purchase price being less than seventy-five percent of the appraised value where the appraisal was unreliable); *see also United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) (noting the "traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships"); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003) (observing that bankruptcy courts have the "equitable power to craft flexible remedies").

The Sale was approved on August 23, 2022 for a purchase price of $675,000, D.E. 1-2, and closed on September 12, 2022, D.E. 14-3. In approving the Sale, the Bankruptcy Court considered two appraisals of the Storms Property. D.E. 21-17 at 6:12-7:14. The first appraisal was effective as of October 24, 2021 and valued the Storms Property at $400,000 with an assumption that it's development was fifty percent complete. D.E. 14-5. The second appraisal was as of July 15, 2022 and valued the Storms Property at $1,040,000 "as-is" (rounded) and $1,350,000 market value upon completion. D.E. 21-2 at 42-75. But, importantly, the July 2022 Appraisal did not take into account deed restrictions against the property, which the Bankruptcy Court noted "certainly[] should be factored into value." D.E. 21-17 at 6:12-21.

Because of the affordable housing deed restrictions, the Court cannot credit the July 2022 appraisal. Such restrictions would lower the value of the property, and Jersey City does not argue to the contrary. As to the October 2021 appraisal, the Court concludes that the Bankruptcy Court's finding that $675,000 was "fair consideration and constitutes reasonably equivalent value for the

10

[Storms] Property" was not clearly erroneous.  D.E. 1-2 at ¶ E; D.E. 18-16 at 7:13-14; *see also In re Pursuit*, 874 F.3d at 136 (reviewing the bankruptcy court's good faith and value findings for clear error).  Applying the October 2021 Appraisal, the Bankruptcy Court determined that the Storms Property was, at the time of the motion, "closer to 90 percent complete," making the appraisal, which assumed fifty percent completion, "low."  D.E. 18-16 at 6:14-7:3.  The Bankruptcy Court found, however, that "if you doubled it to 100 percent, that's [$]800,000, and so then you take off some for the fact that it's still not fully complete, and the [$675,000] seems to be in the range of an adequate purchase price."  *Id.*  6:22-7:3.  In light of the October 2021 Appraisal, and Bankruptcy Court's broad "equitable power to craft flexible remedies," *Chinery*, 330 F.3d at 567, the Court is not "left with the definite and firm conviction" that $675,000 does not constitute fair value for the Storms Property, *In re CellNet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003) (citation and internal quotation marks omitted).

Turning to the next prong, Section 363(m) will only moot a challenge to a bankruptcy sale if the sale was not stayed pending appeal.  *In re Pursuit*, 874 F.3d at 135 (citation omitted).  Jersey City concedes that the sale was not stayed pending appeal.  Opp. at 27.  As noted, this Court previously denied Jersey City's motion to stay the Bankruptcy Court's Sale Order.  D.E. 9.  Thus, this element is satisfied.

The final requirement considers the appellant's requested remedies to determine whether "the court, if reversing or modifying the authorization to sell or lease, would be affecting the validity of such a sale or lease."  *In re Pursuit*, 874 F.3d at 135 (citation omitted).  An appellant must show "that a reversal or modification of the sale would not affect the validity of the sale."  *Id.* at 138-39.  This is "a high bar" and "[a] challenge to a 'central element' of a sale inevitably challenges the validity of the sale."  *Id.* at 139 (citation omitted).  This prong reflects "§ 363(m)'s

'clear preference in favor of upholding the validity of bankruptcy sales.'" *Id.* (quoting *In re Brown*, 851 F.3d 619, 623 (6th Cir. 2017)). Appellate rights are preserved "only in those rare circumstances where collateral issues not implicating a central or integral element of a sale are challenged." *Id.* (citation omitted). "In short, the validity prong of our test provides '[a] narrow exception [that] may lie for challenges to the Sale Order that are so divorced from the overall transaction that the challenged provision would have affected none of the considerations on which the purchaser relied.'" *Id.* (alterations in original) (quoting *In re Westpoint Stevens, Inc.*, 600 F.3d 231, 249 (2d Cir. 2010)). The ultimate question is "whether the remedy sought . . . can be granted without impacting the sale's validity. If it cannot, then the appeal is moot." *Id.* at 140; *see also In re Ala. Aircraft Indus., Inc.*, 514 F. App'x 193, 195 (3d Cir. 2013) ("In considering whether reversal or modification would affect the validity of a sale, courts must look to the remedies sought and assess whether these would impact the terms of the bargain struck by the buyer and seller.").

Jersey City points to two remedies that it seeks, which it claims would not affect the validity of the sale: (1) "an order directing the Bankruptcy Court to reinstate" the affordable housing deed restrictions on the Storms Property, which it claims were extinguished by the Sale Order, and (2) "an order directing that the surplus proceeds of the sale . . . be turned over to Jersey City" because the Bankruptcy Court erred in concluding that the merger doctrine limited their recovery "to the portion of its nearly $780,000 loan that had been allocated to the [Storms Property] in the final foreclosure judgment, namely, $125,408.53." Opp. at 28-29.

As to the first remedy, the Sale Order states that certain "liens shall be discharged as against the Property and no monies shall be due at closing or otherwise unless specifically provided in this Order." D.E. 1-2 at ¶ 2. Included in the first row of a chart listing such liens is the affordable housing deed restrictions recorded on May 12, 2010 in Mortgage Book number 17511, page 530.

*Id.* Paragraph 4 of the Sale Order, however, indicates that "[n]otwithstanding anything to the contrary contained herein, *the low and moderate income affordability requirements contained in the Foreclosure Judgment shall remain in full force and effect*." *Id.* ¶ 4 (emphasis added). The Foreclosure Judgment indicates that the Property "shall remain subject to the terms, covenants, conditions, restrictions, limitations and provisions as contained, set forth in the City of Jersey City Affordable Housing Agreement dated May 11, 2010, recorded in the Registrar of Deeds on May 12, 2010, in book 17511, page 530." D.E. 2-16 at 55. The Court does not view the Sale Order as extinguishing the relevant restrictions as discussed below in its analysis of the merits of the appeal.

Next, Jersey City claims that the Bankruptcy Court erred in "concluding that the merger doctrine limited Jersey City's recovery to the portion of its nearly $780,000 loan that had been allocated to the [Storms Property] in the final foreclosure judgment, namely, $125,408.53." Opp. at 29. According to Jersey City, if it prevails on this point, "the remedy would be an order directing that the surplus proceeds of the sale – the $63,450.34 paid to Debtor at closing – would be turned over to Jersey City." *Id.* Jersey City concludes that this relief "would simply re-allocate the surplus proceeds to Jersey City rather than Debtor." *Id.*

In *In re ICL Holding Co., Inc.*, 802 F.3d 547, 554 (3d Cir. 2015), the Third Circuit held that it could "give the [Appellant] the relief it seeks—'a redistribution' of the escrowed funds [among creditors] . . . without disturbing the sale," and thus that such relief was not rendered moot by Section 363(m). But that case is distinguishable. Through its appeal as to the application of the merger doctrine, Jersey City seeks to re-allocate the sale proceeds *from the debtor to itself*, rather than simply among creditors. Such relief, if granted, would affect the bargain that the Debtor struck in agreeing to the Sale, and the Debtor's business judgment in considering the Sale may have been different had it been aware that the bankruptcy estate would ultimately receive none of

the proceeds. Thus, in this portion of the appeal, Jersey City challenges a "central or integral element" of the sale—*i.e.*, what one of the contracting parties received as consideration.

For the foregoing reasons, all requirements for statutory mootness under Section 363(m) are met as to all relief requested, and thus the appeal is statutorily moot.

### B. The Merits of the Appeal

In the alternative, and in the interests of judicial efficiency and further appellate review, the Court addresses the merits of the appeal. *See* D.E. 23. Jersey City argues that the Bankruptcy Court erred in concluding (1) that the Purchaser acted in good faith as required by § 363(m), Merits Br. at 18, and (2) that the Purchaser gave fair and reasonable value for the property, Merits Br. at 21. The Court's analysis above controls, and these two arguments are rejected for the reasons stated.

Jersey City raises additional arguments. First, Jersey City claims that the Bankruptcy Court "erred in forcing Jersey City to accept [Purchaser] under the Development Agreement." Merits Br. at 23. The Development Agreement provides as follows[7]:

> 7.05. <u>Conditions of Transfer</u>. Except as otherwise provided in this Agreement, and except with respect to transfers permitted under Section 7.03, the City shall be entitled to require, as conditions to any such approval of any Transfer provided for in Section 7.02 that:
>
> (a) Any proposed transferee shall have the qualifications and financial responsibility, as reasonably determined by the City,

---

[7] The Development Agreement imposes further "Conditions of Transfer" in subsections (b) through (e). *See* D.E. 21-6 at 31. Jersey City argues that "[t]he Bankruptcy Court did not refer to, or make any findings regarding, any of the other subsections" and that none of these provisions were satisfied. Merits Br. at 24, 30. This passing reference without further development is insufficient to present the issue to the Court. *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue . . . will not suffice to bring that issue before [the] court." (citation and internal quotation marks omitted)). Thus, the Court focuses on subsection (a), which is the only provision Jersey City addresses in substance.

> necessary and adequate to fulfill the obligations undertaken in this
> Agreement by the Developer[.]

D.E. 21-6 at 31.  Appellant claims that the Bankruptcy Court "usurped the rights given to Jersey City under this Agreement[.]"  Merits Br. at 26.  Jersey City continues that it did not and does not consider Purchaser to be "qualified" or "financially responsible" and that the Bankruptcy Court "did not have the authority to interpose its judgment about" whether Purchaser met those requirements.  *Id.* at 28-29.  Jersey City argues that the Bankruptcy Court thus "misinterpreted the Development Agreement in a way that forced Jersey City to accept [Purchaser], even though the Agreement cannot reasonably be interpreted to operate in that manner."  Merits Br. at 30.  And "[e]ven if [the Bankruptcy Court] had that authority," Jersey City argues, "it erred in concluding a person with no meaningful prior experience, no understanding of her legal obligations, and no financial capacity to pay back the balloon note, met those definitions."  *Id.*

The Bankruptcy Court found that Jersey City's objections to the Purchaser under Section 7.05(a) were not reasonable.  D.E. 18-16 at 13:9-15:11 ("[T]he only standard that applies here is 7.05.  And to the extent that the City is applying the standards applicable to applicants for grants . . . that's not reasonable.  I think what the City should do is consider the financial responsibility and qualifications reasonably.").  The Bankruptcy Court went on to find that "[c]ertainly there is a financial responsibility here" because the Purchaser "has enough money, not only to acquire but to finish the housing."  *Id.* at 13:24-14:1; *see also id.* at 11:22-12:12.  The Bankruptcy Court also found that the Purchaser was "highly incentivized to finish this project quickly, to get low income tenants in, and to start collecting rents.  And she knows that along the way she will have to comply with all of the low income housing restrictions."  *Id.* at 12:13-17.  While 108 Storms JC LLC is the Purchaser, Griffiths "personally guaranteed the loan, and . . . put up more than $100,000 of her own money for the balance of the purchase price."  *Id.* at 12:10-13.  Additionally, the financing

Purchaser obtained included "hold backs . . . to make sure the money that's borrowed goes to completion of construction." *Id.* at 12:6-9.

As to qualifications, the Bankruptcy Court found that Purchaser "understands that this is [l]ow income housing. She does have some education with respect to it. And I would hope that once the transaction happens . . . she'd have the guidance of Director Anderson's office[.]" *Id.* at 14:1-7. While Purchaser "is not an experienced developer of low income housing," Director Anderson testified that such a lack of experience "is not a bar." *Id.* at 12:18-24. Moreover, the Bankruptcy Court credited Griffith's testimony that "she has some experience with rental properties. She has family in the real estate industry. She has friends to help her. And again she . . . fully understands the fact that . . . her right to rent this property out is going to be subject to" the affordable housing restrictions. *Id.* at 12:25-13:5. The Bankruptcy Court then explicitly found that Purchaser "satisfied Section 7.05, because . . . she has shown financial responsibility and qualifications. And that the reasons set forth by Jersey City, to suggest otherwise, were based on standards that really don't apply to the transaction that is proposed."[8] *Id.* at 15:6-11.

---

[8] The Bankruptcy Court also appeared to discount Jersey City's argument that it had reasonably determined that Purchaser was unqualified and lacked financial responsibility because Jersey City's desired outcome is to sell the Storms Property at a Sheriff's sale, where Jersey City would not have, as a practical matter, the ability to enforce an "application process" or obtain information about the bidders' qualifications and financial responsibility. D.E. 18-16 at 14:25-15:5. Jersey City claims that "it *does* have control over a prospective purchaser at a Sheriff's sale" because it "would have announced that the Sheriff's sale was subject to conditions" including the affordable housing deed restrictions and "compliance with the Development Agreement." Merits Reply at 10 (emphasis in original). The announcement of restrictions that would remain on the property does not establish that Jersey City would have the right to prevent bids from (or taking possession by) those who do not meet its standards for qualifications and financial responsibility. As the Bankruptcy Court found, "to suggest that all of the bidders at a Sheriff's Sale would have to go through this application process before they could bid, it just doesn't make any sense practically." D.E. 18-16 at 15:2-5.

In addition, Jersey City merely cites to general principles of contract interpretation. *See* Merits Br. at 25 (quoting *Barila v. Bd. of Educ. of Cliffside Park*, 230 A.3d 243, 255 (N.J. 2020)). Bankruptcy Courts, however, are courts of equity which "have broad authority to modify creditor-debtor relationships." *Energy Res. Co.*, 495 U.S. at 549 (citation omitted). The Bankruptcy Court is empowered to "issue any order, process, or judgment that it necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). Thus, this Court finds that the Bankruptcy Court had the power to order a sale under § 363, over Jersey City's unreasonable protestations. A contrary result would allow parties with a mere right of reasonable approval to impede the bankruptcy process and render property virtually inalienable, and the Court has been presented with no authority supporting such a result.

For these reasons, the Court disagrees with Jersey City's argument as to the Development Agreement. Jersey City argues that the "plain language" of Section 7.05(a) "does not operate to compel Jersey City to accept a potential transferee. Rather, it *establishes the conditions that Jersey City, in its reasonable discretion, may demand of any potential transferee.*" Merits Br. at 26 (emphasis in original). The Bankruptcy Court, however, merely determined that Jersey City had exceeded its own authority under the contract by withholding its approval of the Sale unreasonably. The Bankruptcy Court looked to Director Anderson's testimony and declaration on this point. D.E. 18-16 at 10:23-11:1. The Bankruptcy Court found that the documents on which Director Anderson relied were "very important and appropriate . . . when you have a proposed developer who is seeking to use Federal Funds to carry out or develop a low income housing project." *Id.* at 11:9-14. But Purchaser was not such a developer because it "was not seeking Federal funds" to finish developing the Storms Property. *Id.* at 11:15-21. In fact, Director Anderson "testified clearly that the standards that are set forth in the Exhibits to her declaration do not apply to existing approved

projects that are being transferred." *Id.* at 13:14-17; *see also id.* at 13:19-23 ("[T]o the extent that the City is applying the standards applicable to applicants for grants as set forth in Exhibits A through C, that's not reasonable.").

Finding that Jersey City's objections to Purchaser were unreasonable, and that Purchaser was in fact reasonably qualified and financially responsible as set forth in the Development Agreement, the Bankruptcy Court was entitled to exercise its statutory authority to equitably administer the bankruptcy estate and order a sale of real property to a good faith purchaser for fair value. The Court sees no clear error in the factual findings underpinning that decision, nor any error in the legal standards applied.

Next, Jersey City argues that the Bankruptcy Court erred "in applying the merger doctrine to conclude that Jersey City was only entitled to $125,000 of its $780,000 outlay." Merits Br. at 30. As noted, Jersey City obtained a judgment in the foreclosure action in the amount of $733,006.01, with $125,408.53 allocated to the Storms Property and the remaining $647,597.48 allocated to the Bergen Property. D.E. 2-16 at 54. The properties were initially covered by a blanket mortgage, and Jersey City argued that it was due the entire amount of the judgment because the Bergen Property had been lost to the Debtor's estate. Merits Br. at 31. The Bankruptcy Court rejected that argument and found that the merger doctrine applied. D.E. 18-16 at 8:16-9:10.

The merger doctrine provides that "a loan no longer exists after a default leads to the entry of a final judgment." *Gonzalez v. Wilshire Credit Corp.*, 25 A.3d 1103, 1117 (N.J. 2011). A party's contractual rights "merge" into the foreclosure judgment when it is entered. *Customer Bank v. Retinour Inv. Props., LP*, 181 A.3d 1038, 1045 (N.J. App. Div. 2018). Thus, "[u]nder the merger doctrine, a contract is deemed to merge with the judgment, thereby depriving a [party] from being able to assert claims based on the terms and provisions of the contractual instrument."

*In re A & P Diversified Techs. Realty, Inc.*, 467 F.3d 337, 341 (3d Cir. 2006) (citation omitted). "[A] mortgage is merged into the final judgment of foreclosure and the mortgage contract is extinguished, at which point it ceases to exist." *In re Goione*, 595 B.R. 477, 483 (Bankr. D.N.J. 2019) (citing *In re Stendardo*, 991 F.2d 1089, 1095 (3d Cir. 1993)).

The effect of the merger doctrine, as determined by the Bankruptcy Court, was that Jersey City could not recover from the sale of the Storms Property beyond the $125,408.53 allocated to that property in the Foreclosure Judgment. *See* D.E. 18-14 at 13:23-14:1. Jersey City appears to acknowledge that the merger doctrine applies, but argues that it "does not forbid a mortgagee from asking the [state] court to amend a foreclosure judgment based on something that happens post-judgment" under N.J. Ct. R. 4:50-1(f). Merits Br. at 32. Essentially, Jersey City claims that it "would have applied to the State court under N.J. Ct. R. 4:50-1(f) to reallocate the entire debt due as against the [Storms Property]." Merits Br. at 33.

N.J. Ct. R. 4:50-1(f) provides that "[o]n motion, with briefs, and upon such terms as are just, the court may relieve a party . . . from a final judgment or order for . . . any . . . reason justifying relief from the operation of the judgment or order." Jersey City claims that the relief it seeks—amending the Foreclosure Judgment to reallocate its financial distribution among multiple properties—"is generally granted as a matter of course." Merits Br. at 32. The New Jersey Supreme Court, however, has explicitly noted that "[b]ecause of the importance that we attached to the finality of judgments, relief under [N.J. Ct. R.] 4:50-1(f) is available only when truly exceptional circumstances are present." *Housing Auth. of Morristown v. Little*, 639 A.2d 286, 292 (N.J. 1994) (citation and internal quotation marks omitted)). As examples of such "truly exceptional circumstances," the New Jersey Supreme Court cited to a case involving the reopening of a judgment to "prevent recovery of damages for breach of an illegal public contract," *Id.* (citing

*Manning Eng'g, Inc. v. Hudson Cnty. Park Comm'n*, 376 A.2d 1194 (N.J. 1977)), and a case granting relief where a defendant's attorney "was subject to disciplinary proceedings that led to disbarment at [the] time he falsely assured defendants that suit had been taken care of but default judgment was entered against them," *Little*, 639 A.2d at 292 (citing *Court Inv. Co. v. Perillo*, 225 A.2d 352 (N.J. 1966)). Jersey City has not presented any similar injustice or exceptional circumstances; it claims, however, that the Bergen Property was lost to the estate and that Jersey City, but for the automatic stay, would have "applied to the State Court . . . to reallocate the entire debt due as against the [Storms Property]" and that "[t]here is no reasonable dispute" that such a motion to amend the judgment "would have been granted." Merits Br. at 33.

In support, Jersey City cites to *Resolution Trust Corp. v. Griffin*, 674 A.2d 1032, 1034 (N.J. Super. Ct. Ch. Div. 1994). In that case, the plaintiff sought "reimbursement from surplus funds[] for payments of taxes and insurance premiums which it made after entry of final judgment of foreclosure but before the Sheriff's sale." *Id.* at 1033. The New Jersey Supreme Court, after noting the applicability of the merger doctrine, observed as follows:

> Up to a point, a court does have control over its own judgments and on duly served notice, may amend the judgment if deemed right and equitable, provided there is no adverse effect on intervening rights of other parties. [N.J. Ct. R.] 4:50–1(f). It is not unusual in a foreclosure action that a foreclosing bank may discover, after entry of final judgment but before the sheriff's sale is advertised, that additional real estate taxes and, perhaps, insurance premiums, have been advanced by it and not set forth in the affidavit of proof upon which the final judgment has been entered. A motion, at that point, to amend the judgment and writ is rarely, if ever, opposed; the relief is granted; the amount due in both the judgment and writ is ordered amended and the sale then proceeds under the amended writ.

*Id.* at 1034. The *Griffin* court then *declined* to grant plaintiff's requested relief—reimbursement from surplus funds—noting that plaintiff "received what it asked for in applying for the final judgment" and had "only itself to blame if it is out of pocket." *Id.* at 1035. This case does not

20

support Jersey City's argument that highly substantive amendments to a judgment are "generally granted as a matter of course," Merits Br. at 32, particularly where a party would most certainly contest such an amendment.  As a result, the Court finds Jersey City's argument unavailing.[9]

While Jersey City claims that the Bergen Property was removed from the estate via a tax lien foreclosure because of JCCH's "extraordinary financial dereliction," and thus "[n]o General Equity judge in the State would have penalized Jersey City," Merits Br. at 33, the Bankruptcy Court placed some blame on Jersey City as well.  The Bankruptcy Court explained as follows:

> [A]s to the Debtor, you know, causing Jersey City to lose [the Bergen Property], I mean I don't understand -- I don't know how you can argue that because all [Jersey City] had to do was credit bid the 647,597 and Jersey City would have had title to that property. Instead, you let it go to [the tax lien holder] Honey Badger for a fraction of its value.  I mean that was an informed business decision that you made.  So to put all of that blame on Jersey City [*sic*], when all you had to do was pay, I don't know what the number was but it was less than 100,000 I think, all you had to do was pay that to Honey Badger and you would have title in the City.

D.E. 18-14 at 12:8-18.  Thus, Jersey City let the Bergen Property be sold for a relatively small amount.  These circumstances appear to fall short of being "truly exceptional" such that the state court would have certainly granted a modification of the judgment.

Finally, Jersey City claims that the Sale Order "illegally extinguished the affordable housing deed restrictions."  Merits Br. at 33.  Jersey City first claims that "a § 363 sale order *cannot*

---

[9] The Court also notes that the Foreclosure Judgment directly reflects the relief sought by Jersey City in its motion seeking such judgment.  *Compare* D.E. 18-7 at 25-32 (Motion for Final Judgment of Foreclosure), *with* D.E. 2-16 at 53-56 (Foreclosure Judgment).  Jersey City specifically delineated the amounts due on the First Count (relating to the Bergen Property) and Second Count (relating to the Storms Property) and did not include language that would preserve the cross-collateralization from the mortgage.  The Bankruptcy Court also noted that Jersey City apparently "knew how to carve something out of the Merger Doctrine and they clearly did so with regard to the low [income] housing provisions.  They could have done so with regard to the cross collateralization and they didn't."  D.E. 18-14 at 13:6-10.

extinguish affordable housing deed restrictions because deed restrictions do not satisfy any of the five conditions for discharge under § 363(f)." Merits Br. at 34-35 (emphasis in original). Jersey City continues that the Sale Order nonetheless did so, and that Paragraph 4 failed to preserve the affordable housing deed restrictions. *Id.* at 35. Again, Paragraph 4 of the Sale Order states "[n]otwithstanding anything to the contrary contained herein, the low and moderate income affordability requirements contained in the Foreclosure Judgment shall remain in full force and effect." D.E. 1-2 at ¶ 4. The Foreclosure Judgment indicates that the Property "shall remain subject to the terms, covenants, conditions, restrictions, limitations and provisions as contained, set forth in the City of Jersey City Affordable Housing Agreement dated May 11, 2010, recorded in the Registrar of Deeds on May 12, 2010, in book 17511, page 530." D.E. 2-16 at 55.

Jersey City raises two issues with Paragraph 4. First, it claims that the Foreclosure Judgment "references an instrument which has been discharged and is no longer legally binding or encumbering due to ¶ 2 of the [Bankruptcy Court's Sale Order]." Merits Br. at 36 (emphasis omitted). But Paragraph 4 states "notwithstanding anything to the contrary contained herein" (*i.e.*, notwithstanding what is said in Paragraph 2), the low and moderate income affordability requirements survive. D.E. 1-2 at ¶ 4. Jersey City is manufacturing an issue where none exists. Paragraph 4 of the Sale Order clearly preserved the affordable housing deed restrictions despite the language in Paragraph 2. The parties, the Purchaser, and the Bankruptcy Court (and now this Court as well) all appear to agree that the affordable housing deed restrictions remain in full force and effect.

Second, Jersey City argues that its interest is not adequately protected because "a final judgment of mortgage foreclosure is not a recordable document in New Jersey" and thus the restrictions in the final judgment "cannot be recorded and hence cannot 'run with the land' or give

notice to subsequent owners." Merits Br. at 36 (emphasis omitted). The very statute cited by Jersey City, however, indicates that "[d]ocuments affecting real property entitled to recording are . . . certified copies of judgments, decrees and orders of courts of record[.]" N.J.S.A. § 46:26A-2h. The statute also provides that "restrictions affecting the real property or its use" may be recorded. N.J.S.A. § 46:26A-2k. Plaintiff has not cited any authority indicating that a foreclosure judgment may not be recorded under New Jersey law, and the authority appears to be the opposite.[10] *See Sonderman v. Remington Constr. Co.*, 603 A.2d 1, 8 (N.J. 1992) (noting "the standard practice among title searchers is to search for record foreclosure judgments and orders vacating such judgments in the county deed book" and directing that "an *in rem* foreclosure judgment and an order vacating that judgment must be recorded in the same manner as a deed").

The Court finds that the Bankruptcy Court's approach to preservation of the affordable housing restrictions was adequate, and that Jersey City has not demonstrated any error.

**IV.    CONCLUSION**

For the reasons stated herein, JCCH's motion to dismiss the appeal, D.E. 14, is **GRANTED** and the appeal is **DISMISSED with prejudice** as statutorily moot. In the alternative, the Court **AFFIRMS** the Bankruptcy Court's decision on the merits. An appropriate Order accompanies this Opinion.

Dated: May 4, 2023

John Michael Vazquez, U.S.D.J.

---

[10] Jersey City cites two cases in support of this argument, both of which predate N.J.S.A. § 46:26A-2, and neither of which hold or intimate that a final judgment of mortgage foreclosure may not be recorded under New Jersey law. *See* Merits Br. at 36.